*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0395p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

AL PERRY ENTERPRISES, INC.,

*Plaintiff-Appellant,*

v.

No. 06-6505

APPALACHIAN FUELS, LLC,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Kentucky at Ashland.
No. 05-00149—David L. Bunning, District Judge.

Argued: July 18, 2007

Decided and Filed: September 27, 2007

Before: MARTIN and McKEAGUE, Circuit Judges; GREER, District Judge.[*]

---

**COUNSEL**

**ARGUED:** Stephen L. Fink, BARNES & THORNBURG, Fort Wayne, Indiana, for Appellant. Donald M. Snemis, ICE MILLER LLP, Indianapolis, Indiana, for Appellee. **ON BRIEF:** Stephen L. Fink, BARNES & THORNBURG, Fort Wayne, Indiana, for Appellant. Donald M. Snemis, ICE MILLER LLP, Indianapolis, Indiana, for Appellee.

---

**OPINION**

---

GREER, District Judge. This case arises from a bankruptcy court approved sale of the assets and assumption of the executory contracts of Bowie Resources Limited ("Bowie") pursuant to 11 U.S.C. §§ 363 and 365. The sale was made pursuant to an Asset Purchase Agreement (the "purchase agreement") between Bowie and Appalachian Fuels, LLC ("Appalachian Fuels"). The plaintiff, Al Perry Enterprises, Inc. ("Perry"), originally filed this diversity breach of contract action in the United States District Court for the Southern District of Indiana alleging breach of an agreement by Bowie to pay certain commissions to Perry, an obligation which Perry alleged had been assumed by Appalachian Fuels as a result of the purchase agreement. The case was transferred to the United States District Court for the Eastern District of Kentucky and the district court granted Appalachian Fuels' motion for summary judgment.

---

[*]The Honorable J. Ronnie Greer, United States District Judge for the Eastern District of Tennessee, sitting by designation.

Perry appeals the district court's grant of summary judgment and argues that the district court erred by finding that Appalachian Fuels did not assume the obligation to pay commissions to Perry pursuant to the purchase agreement.  For the reasons set forth below, we AFFIRM.

## I.  BACKGROUND

Perry, pursuant to contract, acted as a sales agent for Bowie in securing coal supply contracts. As sales agent, Perry was paid a commission on sales of coal pursuant to these contracts. One such contract was with the Tennessee Valley Authority (TVA). A dispute arose between Bowie and Perry regarding Bowie's obligation to pay commissions to Perry in connection with the TVA contract.  As a result, Perry filed suit against Bowie[1] in the United States District Court for the Southern District of Indiana. The case was resolved by the entry of an agreed judgment (the "agreed judgment")  which required Bowie to continue paying commissions to Perry in connection with its sale of coal to TVA.  The agreed judgment also required Bowie, should it enter bankruptcy proceedings, to assume its contractual obligations to Perry under the agreed judgment.

Bowie and several related entities later commenced voluntary Chapter 11 bankruptcy cases in the Bankruptcy Court for the Eastern District of Kentucky at Ashland.  Bowie operated as a debtor in possession until October 2003, and paid commissions to Perry until July 2003. On September 12, 2003, the bankruptcy court entered an order establishing auction procedures for the sale of Bowie's assets and the assumption and assignment of executory contracts and unexpired leases.

Bowie initially  entered into an asset purchase agreement with JJM Energy, LLC ("JJM") for substantially all of Bowie's assets and the assumption and assignment of executory contracts and unexpired leases, including the TVA contract. In accordance with the bankruptcy court's established auction procedures, a notice of the proposed sale and the opportunity to bid was prepared providing for the debtor to conduct an auction at the offices of its counsel.  Bowie filed a statement of cure amounts, and shortly thereafter a supplemental statement of cure amounts, indicating a cure amount for the TVA contract of zero dollars.  Perry filed an objection to the  cure amount arguing  that it was entitled to past and future commissions under the agreed judgment.  Perry further objected to the proposed sale stating: "[Buyer] apparently is of the position that the TVA Contract may be assumed and assigned without paying commissions due to Perry.  Perry objects to this." (Objection of Perry at 6). The sale to JJM was not consummated and the objection of Perry was continued by the bankruptcy court to be "re-noticed for hearing . . ., if necessary."  No further action was ever taken on Perry's objection.

In October 2003, however, a sale of substantially all of the assets of Bowie to the defendant-appellee, Appalachian Fuels, was proposed. Notice of the proposed sale and the purchase agreement was provided to the creditors of Bowie, including Perry.  The purchase agreement was in all material respects identical to that previously proposed between Bowie and  JJM.  Included in the assets to be purchased by Appalachian Fuels were certain executory contracts, including the TVA contract for the purchase and sale of coal.  All assets were to be delivered "free and clear of all Liens except

---

[1]There were several Bowie related entities involved in the transaction and named as defendants.  For the purpose of our opinion, all Bowie related entities will be referred to as "Bowie."

Permitted Liens,**2** pursuant to section 363 and 365 of the Bankruptcy Code . . ." The purchase agreement provides, in relevant part:

> 2.3 <u>Assumed Liabilities.</u>**3**
>
> (a) At the Closing the Buyer will assume only the following Liabilities and obligations of the Seller which relate to the Business, and which are not paid or discharged at or before Closing (the "Assumed Liabilities"):
>
> (i) All Liabilities for and obligations of the Seller relating to the Purchase Assets or the Business arising after the Closing Date, including all Liabilities and obligations arising in connection with the Executory Contracts . . . .
>
> (b) The Buyer is assuming only the Assumed Liabilities and is not assuming any other liability or obligation of whatever nature, whether presently in existence or arising hereafter. All such liabilities and obligations shall be retained by and remain liabilities and obligations of the Seller.

Perry made no objection to the sale of Bowie's assets, and the bankruptcy court entered a final order authorizing the sale of assets, including the TVA contract, "free and clear of all liens, claims and encumbrances," with the exception of permitted liens. The order provides, in part:

> Upon the closing of the Sale, Buyer shall take title to and possession of the Purchased Assets and Assumed Contracts subject to the Permitted Liens. With the exception of the Permitted Liens, the transfer of title to the Purchased Assets and Assumed Contracts shall be free and clear of any and all liens, claims, interests and encumbrances, including without limitation: . . . (b) any demands or claims of creditors of, or claimants against, Bowie; . . .

The purchase agreement also provides that Appalachian Fuels will assume none of Bowie's debts not expressly set forth in the purchase agreement.

When Perry received no further commission payments from Appalachian Fuels, Perry filed the instant breach of contract action claiming that Appalachian had assumed the commission obligations previously owed to Bowie in connection with the TVA contract as a result of the agreed judgment between Bowie and Perry. Cross motions for summary judgment were filed by the parties and the matter was referred to the Bankruptcy Court for the Eastern District of Kentucky, the same bankruptcy court which had presided over Bowie's bankruptcy proceedings. The bankruptcy court issued proposed findings of fact and conclusions of law and a judgment to the district court, recommending that Perry's motion be denied and that Appalachian Fuel's motion be granted. The

---

**2**The purchase agreement defines "permitted liens" as "any Lien (a) which is assumed or consented to by the Buyer herein (including without limitation, Liens included in the Assumed Liabilities), (b) created by the Buyer, (c) in favor of lessors of any Purchased Asset, or (d) easements rights-of-way, restrictions or minor defects or irregularities in title incurred in the ordinary course of business and encumbrances consisting of zoning restrictions, easements, licenses or restrictions on the use of the Real Property or minor imperfections in title thereto."

**3**Also included in the purchase agreement was a section entitled "2.7 Excluded Liabilities". The obligation of Bowie to pay commissions to Perry is not specifically listed in that section. Section 2.7 does, however, generally exclude all liabilities "except for those specifically assumed pursuant to section 2.3 . . ."

district court entered a memorandum opinion and order adopting the bankruptcy court's recommendation.

## II.  DISCUSSION

The court of appeals reviews *de novo* an order granting summary judgment. *Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005).  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor.  *Id.*

Perry asserts that this is a simple case of contract interpretation and that the asset purchase agreement must necessarily be interpreted to find that Appalachian Fuels voluntarily assumed Bowie's liability to pay sales commissions under the agreed judgment and Appalachian Fuels is, therefore, indebted to Perry for all commissions  for sales of coal under the TVA contract.  Perry argues that the commissions owed to Perry "relat[e] to" and arise "in connection with" the TVA contract, relying on § 2.3(a)(i) of the purchase agreement approved by the bankruptcy court.

Among the "Executory Contracts," listed in schedule 2.1(f) of the purchase agreement is the contract for the purchase and sale of coal between Bowie and the TVA.  Perry submits that because Bowie's obligations to pay commissions to it pursuant to the agreed judgment was dependent upon the TVA contract, the assumption of the TVA contract by Appalachian Fuels necessarily means that Appalachian Fuels assumed the obligation to pay commissions to Perry.  This circuit has not previously considered the effect of a bankruptcy court's approval of the sale of a bankrupt party's assets "free and clear of all liens, claims and encumbrances." We now hold that the effect of the bankruptcy court's order was to extinguish Perry's claim unless it was expressly assumed by Appalachian Fuels as part of the purchase agreement.

The bankruptcy court, in its conclusions of law, cited the case of *Car-Tec, Inc. v. Venture Industries, Inc.* (*In re AutoStyle Plastics, Inc.*), 227 B.R. 797 (Bankr. W.D. Mich. 1998), as a case with similar facts and applied the bankruptcy court's reasoning in that case to the present one. Car-Tec, Inc. ("Car-Tec") was the exclusive sales agent for AutoStyle Plastics, Inc. ("AutoStyle") for automobile components sold almost exclusively to General Motors ("GM").  Under their agreement, AutoStyle would pay to Car-Tec commissions, even after the contract's termination, related to the sale of components for which Car-Tec had obtained purchase orders.  When it began to have severe financial difficulties, AutoStyle announced that it would be ceasing operations and negotiated the lease of its equipment and the sale of substantially all of its operating assets to Venture Industries, Inc. ("Venture"), another manufacturer of automotive components.  Upon the execution of an agreement between AutoStyle and Venture, which specifically provided that it was subject to bankruptcy court approval, GM cancelled all of its purchase orders with AutoStyle and placed new purchase orders with Venture for all the components previously supplied by AutoStyle. Car-Tec had previously negotiated and put in place these purchase orders and argued it should continue to be paid commissions.

AutoStyle immediately filed for bankruptcy and sought court approval of its agreement with Venture.  Like the bankruptcy court in the present case, the bankruptcy court entered an order approving the sale of the assets of AutoStyle "free and clear of all liens, encumbrances, claims, security interests and obligations, except such restrictions and obligations as Venture has expressly agreed to under the terms of the [lease] agreement." *Id.* at 799.  Like Perry, Car-Tec argued that Venture had assumed the contract between Car-Tec and AutoStyle and that it should continue to receive commissions for the sale of those products for which it had obtained purchase agreements with GM. The court recognized that the work performed by Car-Tec for AutoStyle was complete

and that Car-Tec's "right to payment [was] an interest in the property sold by AutoStyle to Venture." *Id.* at 800. Also like Perry, Car-Tec did not file a proof of claim for prospective commissions and did not object to the asset sale. The bankruptcy court held that because Car-Tec's claim was "based on an agreement with AutoStyle, it [was] a pre-petition obligation that should have been brought forward during the bankruptcy . . ." *Id.*

The bankruptcy court found that Car-Tec could have filed a claim even for the sales that had not yet been consummated at the time of the bankruptcy since 11 U.S.C. § 101(5)(A)'s definition of "claim" includes a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured . . ." *Id.* at 800. 11 U.S.C. § 101(5)(A). The Car-Tec court held that when Car-Tec discovered that AutoStyle, Venture and GM were negotiating a deal to transfer the programs in which it had been involved, it should have taken steps to safeguard its position by participating in the negotiations, objecting to the sale, appealing the court's order or even filing suit against GM. Instead, like Perry, Car-Tec filed suit against the purchaser of Venture's assets.

In the instant case, Perry had notice that its right to receive commissions was about to be extinguished by virtue of the asset purchase by Appalachian Fuels and had knowledge that the sale would be free and clear of all liens and claims except for those expressly assumed by the purchaser of Bowie's assets. Nevertheless, Perry chose not to file an objection to the sale of the assets and, but for the sale of assets, Perry would have no claim against Appalachian Fuels. As stated by the district court, to the extent that Perry assumed its interest in the commissions was protected by the asset purchase agreement language, "[i]t made this assumption at its peril."**4**

While not controlling, we find the bankruptcy court's holding in *Car-Tec* to be persuasive and we adopt its holding. The bankruptcy court has clear power to approve the sale of debtors' assets free and clear of any interest or claims that could be brought against the bankrupt estate during bankruptcy pursuant to 11 U.S.C. § 363(f). Perry's claim for commissions for work it had completed prior to the bankruptcy constitutes a pre-petition obligation which satisfies the definition of "claim" in 11 U.S.C. § 101(5)(A) as "a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." Perry's failure to make its claim in the bankruptcy court, therefore, bars its claim unless Appalachian Fuels expressly assumed the obligation of Bowie to pay commissions to Perry.

Perry explicitly acknowledges that the bankruptcy court sale of Bowie's assets "free and clear" of claims bars Perry's claim against Appalachian Fuels for commissions, (Brief of Appellant at 16), and therefore argues, not surprisingly, that Appalachian Fuels "explicitly assumed, by clear and unambiguous language" Bowie's obligation to pay commissions on coal sales made under the TVA contract. Perry specifically argues that Appalachian Fuels assumed all liabilities "relating to" or "arising in connection with" the TVA contract and that Perry's claims for commissions on coal sold pursuant to the TVA contract is a liability "relating to" and "arising in connection with" the TVA contract. We disagree.

---

**4**Perry's contention that it believed it was protected by the language of the asset purchase agreement is somewhat incredible given that the earlier asset purchase agreement with JJM contained identical language, and, with respect to that agreement, Perry acknowledged that the buyer was "of the position that the TVA contract may be assumed and assigned without paying commissions" to Perry. Simply put, Perry's filing of an objection to the proposed sale of assets to JJM in an effort to protect its right to receive further commissions is inconsistent with its argument that identical language in the Appalachian Fuels purchase agreement expressly provided for an assumption by Appalachian Fuels of the obligation to pay commissions, obviating the need for Perry to file its claim in the bankruptcy court.

Bowie's obligation to pay commissions on coal sales is not explicitly mentioned anywhere in the purchase agreement or the bankruptcy court order approving the sale of assets. The obligation to pay commissions to Perry is "related to" and "arising in connection with" the separate contract between Bowie and Perry and not from any obligation created by the TVA contract itself. A copy of the TVA contract is not part of the record in this case and we are not privy to its exact terms. The parties agree, however, that the TVA contract provided Bowie with the right to be TVA's exclusive coal supplier. Presumably, the TVA contract likely also contained the terms and conditions under which coal would be supplied, the type and quality of coal to be supplied, the delivery schedule for the coal, the price to be paid for the coal, the terms of the agreement and the like. These obligations, arising from the express terms of the TVA contract itself, are obligations which "relat[e] to" and "arise in connection with" the TVA contract. Appalachian Fuels clearly assumed Bowie's obligations under the terms of the TVA contract; however, no language, and certainly no "clear and unambiguous language", in the purchase agreement constitutes an assumption of the obligation of Bowie "relating to" and "arising in connection with" a totally separate contract on a totally different subject matter.

Adoption of the interpretation of the purchase agreement argued by Perry would result in the assumption of a myriad of obligations by the buyer of an executory contract even though those obligations were not created by the executory contract and were not expressly referred to in an asset purchase agreement or an order of the bankruptcy court. As Perry concedes, its interpretation of the language of the purchase agreement would require Appalachian Fuels to assume various "ancillary liabilities", such as federal and state permits, rail contracts and third party vendor agreements, which are only tangentially related to the previous owner's operation under the contract. Such a reading of the purchase agreement would lead to potentially absurd results and would have a detrimental effect on the ability of a bankruptcy court to manage bankruptcy estates so as to maximize their value. We, therefore, decline to find an assumption of such obligations by the purchaser of a bankrupt estate's assets absent an express assumption of the obligations. We find no express assumption here.

## III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the decision of the district court.